**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ELEANOR COLMERS COWAN, *individually and on behalf of all others similar situated,*<br><br>*Plaintiff,*<br><br>v.<br><br>GLAMNETIC, LLC,<br>*Defendant.* | Civil No. ELH-26-3406 |

**MEMORANDUM OPINION**

In this putative class action, named plaintiff Eleanor Colmers Cowan, a Maryland resident, filed suit against Glamnetic, LLC ("Glamnetic"), a limited liability company organized under the laws of Delaware. ECF 1-2, ¶¶ 9, 15. In particular, plaintiff alleges, on behalf of a class of Maryland residents, that Glamnetic violated the Maryland Commercial Electronic Mail Act ("MCEMA"), Md. Code §§ 14-3001 *et seq*. of the Commercial Law Article ("C.L."), by disseminating marketing emails containing false or misleading information in the subject lines "with the capacity, tendency, or effect of deceiving the recipient." *Id.* ¶¶ 2, 76–90.

The "Class Action Complaint" (ECF 1-2) was initially filed in the Circuit Court for Baltimore City. Defendant removed the case to federal court on two grounds: Diversity jurisdiction under 28 U.S.C. § 1332(a)(1), and the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). *See* ECF 1 at 1.

Plaintiff has filed a "Motion to Remand" the case to State court (ECF 7), supported by a memorandum. ECF 7-1 (collectively, the "Motion"). Cowan presents three arguments for remand. First, plaintiff contends that she has not alleged facts to support a finding that she has standing

under Article III of the Constitution. ECF 7-1 at 5–8. Rather, plaintiff posits that she merely alleges statutory violations by Glamnetic and, under federal law, a statutory violation, without more, does not give rise to a concrete injury, which is required to establish Article III standing. *Id.* In the alternative, plaintiff argues that Glamnetic has not satisfied the amount in controversy requirement of $75,000, which is required to establish diversity jurisdiction under 28 U.S.C. § 1332(a). *Id.* at 8–10. Also in the alternative, plaintiff argues that Glamnetic has not satisfied the $5 million in controversy requirement under 28 U.S.C. § 1332(d)(2), which is necessary to establish jurisdiction under CAFA. *Id.* at 10–14.

Defendant opposes the Motion. *See* ECF 9, ECF 9-1 (collectively, the "Opposition"). Glamnetic maintains that the alleged injury is cognizable under Article III. ECF 9-1 at 1–2. Further, defendant asserts that the case meets the diversity and amount in controversy requirements to support subject matter jurisdiction under CAFA or ordinary diversity jurisdiction. *Id.* at 2–3. Plaintiff has replied. ECF 10 (the "Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion.

## I. Factual Background

Glamnetic "markets and sells press-on nails, artificial nails, magnetic eyelashes, magnetic eyeliner . . . beauty products . . . and related consumer products . . . ." ECF 1-2, ¶ 2. Defendant "markets its products through commercial email campaigns that advertise sitewide sales, percentage-off discounts" and other promotions. *Id.* ¶ 3.

Plaintiff alleges that Glamnetic repeatedly utilized email marketing campaigns that created a false sense of urgency for the email recipients. *Id.* ¶¶ 35–41. Glamnetic sent emails with subject lines representing that a sale or promotion was ending imminently, using phrases such as "LAST

CALL," "FINAL HOURS," "THIS IS IT," "ENDS TODAY," "Last Chance," "Ends Soon," and "FINAL HOURS," when, in fact, the promotions continued beyond the advertised end dates, often until the next day. *Id.* ¶ 36. Glamnetic would then send follow-up emails announcing that the sales had been "EXTENDED" when, according to plaintiff, the extension was never a genuine extension at all. *Id.* ¶ 39. Rather, it was part of a pre-planned marketing strategy. *Id.*

The Complaint provides numerous examples. On November 27, 2023, Glamnetic sent an email with the subject line "Ends Soon: Cyber Monday!!" *Id.* ¶ 36. Later the same day, Glamnetic sent an email with the subject line "Re: FINAL HOURS Cyber Monday." *Id.* And, the following day, November 28, 2023, Glamnetic sent an email stating: "Cyber Monday Sale EXTENDED!" *Id.* The Complaint provides similar examples from 2024, 2025, and 2026. *Id.*

The most recent examples are from July 2026. On July 24, 2026, Glamnetic disseminated an email with the subject line "LAST CALL: Your 40% Off ends tonight." *Id.* The following day, July 25, 2026, Glamnetic sent an email stating: "Surprise 🎉 40% Off Sale Extended." *Id.* Later the same day, Glamnetic sent another email that said: "Wait, you still have time to save 40% 👀." *Id.*

Notably, plaintiff received and retained the emails of July 24 and 25, 2026. ECF 1-2, ¶ 62. She did not receive other emails, but they were identified through counsel's investigation. *Id.*

According to plaintiff, Glamnetic knew or had reason to know that the recipients of these emails were Maryland residents. *Id.* ¶¶ 51–59 (Section D). Defendant had access to "email and mailing addresses, Internet and network activity information, including IP addresses, device identifiers, referring websites, and website-interaction information" of consumers. *Id.* ¶ 52.

Plaintiff seeks class certification, statutory damages of $500 for each violation, attorneys' fees, costs, and any other relief available under Maryland law. ECF 1-2, ¶¶ 90–91.

Additional facts are included in the Discussion.

## II. Legal Standards

### A. Removal

Under 28 U.S.C. § 1441(a), the general removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" may be "removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." But, "removal jurisdiction raises significant federalism concerns." *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941)).

In particular, federal courts are "courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014). They "may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). Therefore, a federal court must presume that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper. *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (citing *Kokkonen*, 511 U.S. at 377).

Congress may not confer jurisdiction absent a constitutional basis. *Shamrock Oil*, 313 U.S. at 108–09 ("The power reserved to the states under the Constitution to provide for the determination of controversies in their courts, may be restricted only by the action of Congress in conformity to the Judiciary Articles of the Constitution."). Accordingly, courts "must strictly construe" removal statutes and resolve all doubts in favor of remanding a case to state court. *Mulcahey*, 29 F.3d at 151.

The removing party bears the burden of demonstrating jurisdiction and the propriety of removal. *See McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (Agee, J., concurring in part and dissenting in part), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (en banc); *Mulcahey*, 29 F.3d at 151. Therefore, "[i]f a plaintiff files suit in state court and the defendant seeks to adjudicate the matter in federal court through removal, it is the defendant who carries the burden of alleging in his notice of removal and, if challenged, demonstrating the court's jurisdiction over the matter." *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008). In this way, a failure of proof that jurisdiction exists cuts against the removing party. And, if "a case was not properly removed, because it was not within the original jurisdiction" of the federal court, then "the district court must remand [the case] to the state court from which it was removed." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 8 (1983) (citing 28 U.S.C. § 1447(c)).

Notably, "[t]he determination of jurisdiction is based only on the allegations in the plaintiff's well-pleaded complaint—not on any issue the defendant may raise." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025) (citation omitted); *see also Black v. Mantei & Assocs., Ltd.*, 145 F.4th 528, 535 (4th Cir. 2025) (same); *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) ("A district court may limit its standing inquiry to the allegations of the complaint"). Moreover, "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 809 n.6 (1986).

**B. Article III Standing**

To invoke the power of a federal court, a plaintiff must demonstrate standing under Article III of the Constitution. *See Frazier v. Prince George's Cnty, Maryland*, 140 F.4th 556, 562 (4th

Cir. 2025); *Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017). Indeed, "[i]t is axiomatic that the Article III standing requirements apply to all actions in the federal courts." *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011); *see In re Trump*, 958 F.3d 274, 324 (4th Cir. 2020) (en banc) ("The requirements for Article III standing are well established, and they apply in all cases regardless of the plaintiff or the particular theory of standing being asserted.") (Wilkinson, J., dissenting, joined by Agee, Niemeyer, Quattlebaum, and Rushing, JJ.), *vacated on other grounds sub nom. Trump v. D.C.*, 592 U.S. 1233 (2021).

Therefore, a case may proceed in federal court only if a plaintiff's allegations satisfy the requirements of Article III, which reflect the "constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). If a plaintiff lacks Article III standing, the court lacks subject matter jurisdiction to hear the claim. *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458–59 (4th Cir. 2005). Accordingly, whether a plaintiff has Article III standing is a threshold question in every federal case. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Public Interest Legal Foundation, Inc. v. Wooten*, 164 F.4th 362, 365 (4th Cir. 2026); *see also Albert v. Lierman*, 152 F.4th 554, 559 (4th Cir. 2025) ("[S]tanding and ripeness are threshold jurisdictional issues to be decided before a court considers the merits of a case[.]"); *N. Virginia Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 488 (4th Cir. 2025) (describing standing as the "threshold question"). Plaintiff contends that she lacks standing.

Where a case has been removed from a state court, the court must remand the case to the state court if the plaintiff lacks standing. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). Indeed, "just as a district court must dismiss a case originally filed in federal court if it 'determines at any time that it lacks subject-matter jurisdiction,' Fed. R. Civ. P. 12(h)(3), it

also must remand whenever it reaches the same conclusion about a case that was removed from state court." *ColonialWebb Contractors Co.*, 175 F.4th at 258 (citing 28 U.S.C. § 1447(c)); *see Davis v. First Nat'l Bank of Pennsylvania*, SAG-24-1575, 2024 WL 4007947 at *3 (D. Md. Aug. 30, 2024) ("Where a federal court finds a case that has been removed from state court . . . does not satisfy the requirements of Article III standing, it is obligated to remand that matter to state court.").

It is a bedrock principle that Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *see Sheppheard v. Morrisey*, 143 F.4th 232, 242 (4th Cir. 2025). Indeed, "'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)); *see Murthy v. Missouri*, 603 U.S. 43, 56 (2024) ("Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"); *So. Car. State Conference of the NAACP v. Weaver*, 181 F.4th 353, 366 (4th Cir. 2026) (same); *Rouse v. Fader*, 171 F. 4th 272, 280 (4th Cir. 2026) ("Federal courts may resolve only 'Cases' and 'Controversies.' U.S. Const. art. III, § 2, cl. 1. Among other things, this limitation on the power of federal courts requires as plaintiff to have 'standing' to bring suit."); *Opiotennione v. Bozzuto Mgmt. Co.*, 130 F.4th 149, 153 (4th Cir. 2025) ("Article III of the constitution limits the judicial power of the United States to 'Cases' and 'Controversies.'").

A "case or controversy exists only when at least one plaintiff" establishes standing to sue. *Murthy*, 603 U.S. at 57 (citing *Raines*, 521 U.S. at 818). Notably, "the doctrine of standing [serves] as a means to implement" the case or controversy requirement. *Laufer*, 60 F.4th at 161; *see*

*TransUnion*, 594 U.S. at 423 ("For there to be a case or controversy under Article III, the plaintiff must have . . . standing."); *Spokeo*, 578 U.S. at 338 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *So. Car. State Conference of the NAACP*, 181 F.4th at 366 ("To fulfill the case-or-controversy requirement, a plaintiff must have standing—a 'personal stake' in the suit she brings."). In other words, "[t]he standing inquiry asks whether a plaintiff ha[s] the requisite stake in the outcome of a case." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018).

Federal courts "do not adjudicate hypothetical or abstract disputes." *TransUnion*, 594 U.S. at 423. A federal court may resolve only "a real controversy with real impact on real persons." *American Legion v. American Humanist Assn.*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring in judgment). When there is no case or controversy, "the court's subject matter jurisdiction ceases to exist." *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same). In the absence of a case or controversy, "the courts have no business deciding [the case]." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

To establish standing under Article III of the Constitution, a plaintiff must satisfy three elements: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423 (citing *Lujan*, 504 U.S. at 560–61); *see Food and Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *Poppleton Now Cmty. Ass'n, Inc. v. La Cite Dev., LLC*, 175 F.4th 455, 462 (4th Cir. 2026); *Rouse*, 171 F.4th at 280; *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 420 (4th Cir. 2025).

Requiring a plaintiff to demonstrate these three elements "ensures that federal courts decide only 'the rights of individuals,' and that federal courts exercise 'their proper function in a limited and separated government.'" *TransUnion*, 594 U.S. at 423 (citations omitted).

At the pleading stage, to establish standing, a plaintiff must "'clearly allege facts demonstrating'" an injury in fact. *Opiotennione*, 130 F.4th at 153 (citation omitted). When standing is challenged on the pleadings, "a court 'accept[s] as valid the merits of [the plaintiff's] legal claims.'" *Laufer*, 60 F.4th at 161 (quoting *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022)) (alterations in *Laufer*); *see Deal*, 911 F.3d at 187 (stating that the court accepts "'as true all material allegations of the complaint and construe[s] the complaint in favor of the complaining party.'") (citation omitted). But, a district court "may conduct an evidentiary hearing." *Laufer*, 60 F.4th at 161.

The requirement of Article III standing applies with no less force in the context of class actions. Although "[e]very class member must have Article III standing in order to recover individual damages," *TransUnion*, 594 U.S. at 431, the Fourth Circuit has analyzed standing in the early stages of a class action "based on the allegations of personal injury made by the named plaintiffs." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (internal quotation marks omitted).

The dispute here focuses on the "'[f]irst and foremost' of standing's three elements"—injury in fact. *Spokeo*, 578 U.S. at 338 (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103 (1998)); *see Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin*., 172 F.4th 361, 368 (4th Cir. 2026) (en banc) ("*AFSCME*"). "[A]n injury in fact is 'an invasion of a legally protected interest' which is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Opiotennione*, 130 F.4th at 153 (quoting *Lujan*, 504 U.S. at 560). Therefore,

under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a personal, particularized injury." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013).

"Concreteness and particularity are two different requirements . . . ." *Opiotennione*, 130 F.4th at 153. "[A]n injury is 'particularized' if it 'affect[s] the plaintiff in a personal and individual way.'" *Id.* (quoting *Spokeo*, 578 U.S. at 339) (second alteration in *Opiotennione*); *see Food and Drug Admin.*, 602 U.S. at 381. A concrete injury is one that is "'real, and not abstract.'" *TransUnion*, 594 U.S. at 424 (citation omitted); *see Food and Drug Admin.*, 602 U.S. at 381.

"'[F]inancial harm is a classic and paradigmatic form of injury in fact.'" *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) (quoting *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018)). But, "[v]arious intangible harms can also be concrete." *TransUnion,* 594 U.S. at 425; *see Baehr,* 953 F.3d at 252. The Supreme Court has said, *TransUnion*, 594 U.S. at 425: "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." (citing, *inter alia*, *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008) (disclosure of private information); *Gadelhak v. AT&T Services, Inc*., 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (intrusion upon seclusion), *cert. denied*, 593 U.S. 938 (2021)); *see also Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019) ("Intrusions upon personal privacy were recognized in tort law and redressable through private litigation.").

"[A] redressable injury must be traceable to a defendant's act or omission." *Rouse*, 171 F.4th at 280. The traceability prong of standing requires a plaintiff's alleged injury to be "fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation and internal

brackets omitted; alterations added); *see Murthy*, 603 U.S. at 57-58. But, "traceability does not require showing proximate causation . . . ." *Rouse*, 171 F.4th at 280 n.8 (citing *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019)).

Of significance, the existence of an applicable statute that authorizes legal action under certain circumstances does not automatically create standing. In other words, "plaintiffs cannot establish a cognizable injury simply by pleading a statutory violation." *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921 (4th Cir. 2022); *see Raines*, 521 U.S. at 820 n.3 ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").

Notably, "an injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427; *see AFSCME*, 172 F.4th at 368. Congress "may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Spokeo*, 578 U.S. at 341 (alteration in *Spokeo*) (citation omitted). And, Congress is "well positioned to identify intangible harms that meet minimum Article III requirements," so "its judgment is . . . instructive and important." *Id.* However, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341. Put another way, "Congress's determination that a cause of action exists does not displace [the] 'irreducible constitutional minimum' of standing." *Krakauer*, 925 F.3d at 652 (citation omitted).

In *TransUnion*, 594 U.S. at 417, the Supreme Court said: "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally

recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms." (quoting *Spokeo*, 578 U. S. at 340–41). Although there need not be "an exact duplicate in American history and tradition," a federal court is not entitled to "loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *TransUnion*, 594 U.S. at 424–25.

An injury in fact must also be actual or imminent. The concepts of actual, ongoing injury or imminent injury are "disjunctive." *Deal*, 911 F.3d at 189. Ongoing injuries are, "by definition, actual injuries for purposes of Article III standing." *Id.* The imminence requirement is a "'somewhat elastic concept.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). Its "'purpose'" is "'to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.'" *Id.* (citation omitted) (emphasis in *Clapper*).

A threatened injury can also satisfy Article III standing. *Beck*, 848 F.3d at 271; *see South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019). However, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis and alteration in *Clapper*). Thus, "to establish Article III injury, a plaintiff must plead and prove that it has suffered (or will imminently suffer, absent a court's intervention) a concrete injury." *AFSCME*, 172 F.4th at 368.

**C. Jurisdiction**

**1. In General**

"A federal court cannot adjudicate a suit's merits without first ensuring it has subject matter jurisdiction." *ColonialWebb Contractors Co. v. Hill Phoenix, Inc.*, 175 F.4th 253, 258 (4th Cir. 2026). As noted, defendant removed the case from State court, asserting subject matter jurisdiction

based on diversity and under CAFA. *See* ECF 1. Plaintiff challenges both of defendant's asserted bases of subject matter jurisdiction. *See* ECF 7. In any event, the Court has an independent duty to determine whether it possesses subject matter jurisdiction. *Wells v. Johnson*, 150 F.4th 289, 297 (4th Cir. 2025) (stating that "federal courts must confirm for themselves that they have jurisdiction. That duty includes ensuring that a plaintiff has standing.").

"'Jurisdiction' is a word of 'many, too many, meanings.'" *Bloosurf, LLC v. T-Mobile USA, Inc.*, 170 F.4th 264, 268 (4th Cir. 2026) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004)) (cleaned up). Subject matter jurisdiction pertains to a court's "authority to adjudicate the cause." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007). It does not refer to the validity of a cause of action or "a meritorious defense." *Bloosurf, LLC*, 170 F.4th at 269.

Notably, "[t]he 'mere presence of a federal issue in a state cause of action' is not, by itself, enough to confer federal question jurisdiction." *Vlaming v. West Point School Board*, 10 F.4th 300, 306 (4th Cir. 2021) (citation omitted). Moreover, a defense based on a federal statute "alone cannot establish jurisdiction." *Id.* at 307.

**2. Diversity Jurisdiction**

Diversity jurisdiction under 28 U.S.C. § 1332(a)(1) requires: (1) Complete diversity of citizenship between all plaintiffs and all defendants; and (2) an amount in controversy exceeding $75,000, exclusive of interest and costs, as to each plaintiff. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). For diversity purposes, the citizenship of a limited liability company "is determined by the citizenship of all of its members." *Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011).

"Courts generally accept the sum claimed by the plaintiff in good faith as the amount in controversy." *Ministry of Defence of the State of Kuwait v. Naffa*, 105 F.4th 154, 159 (4th Cir.

2024) ("*Kuwait*"); *see JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 638 (4th Cir. 2010). Moreover, "[d]ismissal for failure to meet the amount in controversy is . . . appropriate only where the court determines to a legal certainty that the plaintiff cannot recover the amount it seeks . . . ." *Kuwait*, 105 F.4th at 159.

The amount in controversy requirement for diversity jurisdiction is met in a class action if at least one of the named plaintiffs has a claim that exceeds $75,000. *See, e.g.*, *Rosmer v. Pfizer Inc.*, 263 F.3d 110, 122 (4th Cir. 2001). In a removal posture, the defendant need only allege the jurisdictional amount through a short and plain statement containing "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 88 (2014).

"Generally, attorney's fees are not included in the amount-in-controversy calculation, but courts have created two exceptions to this rule: (1) If the fees are provided for by contract; or (2) **if a statute mandates or allows payment of attorney's fees**." *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 368 (4th Cir. 2013) (citation omitted) (emphasis added).

### 3. CAFA Jurisdiction

Under CAFA, federal jurisdiction with respect to a class action requires: (a) Minimal diversity, *i.e.*, that at least one class member be a citizen of a different state than any defendant; (b) an aggregate class of at least 100 members; and (c) an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2)(A), (d)(5)(B), (d)(6). "In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(6).

## III. Discussion

### A. Article III Standing

#### 1.

The parties dispute whether plaintiff has Article III standing. They focus on the first of the three standing requirements: whether plaintiff has alleged "an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion*, 594 U.S. at 423. Plaintiff contends that the Complaint alleges only a statutory violation, which, without more, does not constitute a concrete injury. ECF 7-1 at 5 (citing *TransUnion*, 594 U.S. 413; *Spokeo*, 578 U.S. 330). In her view, this Court's decision in *Carter v. Vineyard Vines, LLC*, ELH-25-3178, 2026 WL 1429258 (D. Md. May 21, 2026), which also concerned "deadline" and "extension" emails, requires remand. ECF 7 at 1; ECF 7-1 at 6.

Plaintiff observes that the Complaint in *Carter* was "stronger," without saying as compared to what, but explains that "each named plaintiff had a customer account, made purchases, and identified between 32 and 44 allegedly deceptive emails." ECF 7-1 at 2. By contrast, plaintiff "never purchased from Glamnetic and did not purchase in response to the challenged message," and "[s]he seeks the statutory remedy rather than out-of-pocket damages." *Id.* at 6 (citing ECF 1-2, ¶¶ 13, 50, 65, 89–90). According to plaintiff, the Complaint does not allege that she relied on a subject line, was actually deceived, lost money or time, suffered inbox impairment, or "considered the messages unwanted." ECF 7-1 at 1.

Defendant responds on two principal fronts. First, relying on *Beyond Systems, Inc. v. Kraft Foods, Inc.*, 777 F.3d 712 (4th Cir. 2015), as well as *Baehr*, 953 F.3d at 244, and a series of out-of-circuit decisions, defendant argues that plaintiff alleges the very harm that the Maryland General Assembly enacted MCEMA to prevent. ECF 9-1 at 8–13. Second, defendant attempts to

distinguish *Carter*, 2026 WL 1429258. Glamnetic maintains that the Court's analysis in *Carter* of the common law analogs, *id.* at *22–26, "turned on the absence of allegations that the emails were unsolicited," and that "the presence of factual allegations that suggested the emails were solicited was central to this Court's conclusion . . . ." ECF 9-1 at 4, 6. The *Carter* plaintiffs, defendant notes, "voluntarily created accounts" and supplied their email addresses to the company. *Id.* at 14.

In contrast, plaintiff alleges that she "never purchased from Defendant, created a Glamnetic customer account, enrolled in a Glamnetic loyalty or paid-membership program, downloaded or used a Glamnetic app, signed up for Glamnetic text messages, or otherwise entered into a purchase transaction or paid relationship with Defendant." ECF 1-2, ¶ 13. From this, defendant reasons that "[t]he clear implication of these allegations is that [plaintiff] is claiming that the emails were unwanted" (ECF 9-1 at 15), and that she therefore alleges the receipt of uninvited emails that bear a close relationship to "the common law torts of intrusion upon seclusion and private nuisance." *Id*.

In reply, plaintiff asserts that defendant's theory "depends on repeatedly converting silence into an allegation." ECF 10 at 1. She stresses that a "no-paid-relationship is not the same allegation as no agreement to receive email," and that *Carter* "did not establish a paid-relationship proxy for consent; it examined what the complaint actually alleged." *Id.* at 3. Plaintiff also maintains that decisions of this District applying *TransUnion*, including *Smith v. Lane Bryant Brands Opco LLC*, SAG-25-3766, 2026 WL 1745684 (D. Md. June 17, 2026), foreclose reliance on *Beyond Systems*. *Id.* at 4.

As noted, the party invoking federal jurisdiction bears the burden of establishing standing. *Lujan*, 504 U.S. at 561; *see Strawn*, 530 F.3d at 296. Defendant acknowledges that its position as

the removing party "'create[s] the anomalous situation in which Defendant . . . asserts Article III standing exists.'" ECF 9-1 at 5 (citing *Carter*, 2026 WL 1429258, at *13) (alterations added). Therefore, defendant has the burden to show that the Complaint alleges a concrete injury suffered by plaintiff. If defendant cannot do so, remand is required. *See* 28 U.S.C. § 1447(c).

**2.**

Defendant's principal argument is that *Carter*, 2026 WL 1429258, does not govern here, because it is factually distinguishable. ECF 9-1 at 2, 12–16. Therefore, I begin with a review of *Carter*.

In *Carter*, the plaintiffs invoked MCEMA and its Indiana counterpart to challenge subject lines in email communications announcing, *inter alia*, that a sale was ending, followed by messages announcing that the sale had been extended. I concluded that "mere receipt of emails with misleading or false subject lines does not, by itself, constitute a concrete injury sufficient to confer Article III standing." *Carter*, 2026 WL 1429258, at *26. That conclusion rested on several considerations.

First, applying *TransUnion* and *Spokeo*, I rejected the contention that a plaintiff suffers a concrete injury merely because the defendant sent the type of email that the legislature sought to prohibit. *Id.* at *16. Second, I considered whether the plaintiffs had alleged harm bearing a close relationship to the torts of intrusion upon seclusion, nuisance, or fraud. As to the privacy-based analogs, I observed that the decisions on which Vineyard Vines relied involved communications that the recipients had not invited, whereas the *Carter* plaintiffs "chose to open a Vineyard Vines account, provided the Company with an email address, and made purchases through that account." *Id.* at *22. And, I noted: "Nowhere do they allege that all emails were unwanted or that they ever sought to stop receiving them." *Id.* at *23. As to fraud and nuisance, I concluded that the plaintiffs

had not alleged the harm-defining elements of either tort: detrimental reliance, in the case of fraud, and substantial and unreasonable interference with the use and enjoyment of property, in the case of nuisance. *Id.* at *25–26. Moreover, I declined to permit defendant to create standing by embellishing the Complaint. *See id.* at *26.

Glamnetic is correct that *Carter* treated solicitation as significant to the privacy analogs. I observed that the Fourth Circuit's privacy-based decisions "establish that the analog turns on whether the alleged invasion was non-consensual," and that the California decisions on which Vineyard Vines relied involved emails that were "entirely unsolicited." *Id.* at *19, 21. Glamnetic is also correct that, unlike the *Carter* plaintiffs, plaintiff does not allege an account, a purchase, or a similar relationship with the defendant. ECF 1-2, ¶ 13. Thus, the two cases are not identical. But, the question is whether this difference suffices to render *Carter* inapplicable. In my view, it does not.

First, defendant's argument depends on an allegation that is not in the Complaint. *Carter* distinguished itself from the Fourth Circuit's privacy-based decisions because the *Carter* plaintiffs did not allege that the emails were unsolicited or unwanted. *Carter*, 2026 WL 1429258, at *21; *see id.* at 20 (discussing *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361 (4th Cir. 2026); *O'Leary v. TrustedID, Inc.*, 60 F.4th 240 (4th Cir. 2023); and *Garey v. James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022)). The same is true here. Plaintiff does not allege that she never agreed to receive defendant's emails, that she did not want them, that she objected to them, or that she tried to stop them. Indeed, she has repeatedly stated that she "does not allege that Defendant's emails were unsolicited, unwanted, harassing, or sent after Plaintiff attempted to stop them." ECF 7-1 at 6; *see* ECF 10 at 1, 4, 6. Defendant identifies no allegation in the Complaint that says otherwise. Rather, from plaintiff's allegation that she never made a

purchase, created an account, or otherwise entered into a "paid relationship" with defendant, defendant asks the Court to infer "that the emails were unwanted." ECF 9-1 at 10; *see id.* at 15. By defendant's own description, this is a matter of "implication." *Id.* at 10, 15.

Defendant contends that plaintiff's omission of the word "unsolicited" is the product of "careful avoidance" of that term by plaintiff. *Id.* at 10. And, defendant asserts that the Complaint "goes out of its way to create the impression" that plaintiff never wanted defendant's emails. *Id.* at 18. But, defendant cites no authority for the proposition that plaintiff was required to state that she solicited the emails.

As noted, at the pleading stage, a plaintiff must "'clearly allege facts demonstrating'" an injury in fact. *Opiotennione*, 130 F.4th at 153 (citation omitted). An implication or an impression is not a clearly alleged fact. Nor may standing be created through the "embellishing [of] otherwise deficient allegations." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 179 (4th Cir. 2013)) (alteration added). Of import, "[t]he determination of jurisdiction is based only on the allegations in the plaintiff's well-pleaded complaint—not on any issue the defendant may raise." *Royal Canin*, 604 U.S. at 26 (citation omitted). And, "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell Dow*, 478 U.S. at 809 n.6. Plaintiff has not advanced the theory that the emails were unwanted. Rather, it is defendant that has done so.

Ordinarily, when standing is challenged on the basis of the pleadings, the court construes the complaint "in favor of the complaining party." *Deal*, 911 F.3d at 187 (citation omitted). That rule affords a plaintiff the benefit of reasonable inferences in establishing her own standing. Here, however, it is the removing defendant—bearing the burden to establish jurisdiction—that asks the Court to read the Complaint to allege a harm that plaintiff herself says the Complaint does not

allege. Defendant cites no authority permitting the party that bears the burden to draw inferences against the plaintiff in order to find an injury that the plaintiff has not claimed.

This Court confronted a similar circumstance in *Carter*. There, as here, the defendant repeatedly described the emails as "unwanted," although the plaintiffs did not so complain. The Court characterized defendant's "interpretation of the Complaint [as] unmoored from its plain text." *Carter*, 2026 WL 1429258, at *24. Moreover, the Court addressed defendant's effort to distinguish *Asabre v. Retail Services & Systems, Inc.*, PWG-22-148, 2022 WL 4326536 (D. Md. Sept. 19, 2022), in which Judge Grimm remanded a suit brought pursuant to MCEMA, containing similar allegations of unsolicited, deceptive emails. The *Carter* Court stated that defendant's position rested on "injuries defendant has invented, not injuries plaintiffs have alleged." *Carter*, 2026 WL 1429258, at *17.

The same may be said here. Defendant characterizes the emails as "unwanted" time and again. *See* ECF 9-1 at 4, 10, 11, 15. But, that is not plaintiff's characterization.

Second, the inference that defendant asks the Court to draw is not a reasonable one, much less one that satisfies defendant's burden. Paragraph 13 of the Complaint is notable for what it omits. It lists a series of things that plaintiff did not do, such as purchase a product, use a Glamnetic app, or create a customer account with defendant. *See* ECF 1-2, ¶ 13. But, the absence of a purchase, an account, or a paid relationship says little about whether a consumer agreed to receive promotional emails. A consumer who has never bought anything from a retailer may nonetheless have given the retailer an email address in order to receive the retailer's promotions. Indeed, a promotional email list is a natural means of reaching those who have yet to become customers.

Moreover, ¶ 13 does not allege that plaintiff never provided her email address to defendant, never subscribed to defendant's marketing emails, or never asked to receive them. *Id.* The

Complaint describes defendant's "marketing" to include "commercial electronic mail messages sent to consumers on the Glamnetic email marketing list." *Id.* ¶ 27. And, it alleges that the representative messages included mechanisms to unsubscribe or manage preferences. *Id.* ¶ 32. But, the Complaint does not allege that plaintiff used such mechanisms.

Notably, defendant's account of ¶ 13 goes beyond its text. Defendant asserts that plaintiff "provides allegations where she contends that she did not invite the communications from Glamnetic." ECF 9-1 at 16 (citing ECF 1-2, ¶ 13). But, ¶ 13 says nothing about uninvited communications. At most, the Complaint is consistent with either consent or its absence. In a jurisdictional challenge to a removal action, such balance favors remand. *See Mulcahey*, 29 F.3d at 151 (courts "must strictly construe" removal statutes and resolve all doubts in favor of remand).

Moreover, plaintiff need not allege that she did not consent to a commercial email in order to state a claim under MCEMA. The statute applies to "both solicited and unsolicited emails." *Carter*, 2026 WL 1429258, at *22 (citing C.L. § 14-3002(b)). Because the lack of consent is not an element of the statutory claim, its absence from the Complaint cannot be read as an implied allegation of it. Defendant also points to the fact that, unlike in *Carter*, the Complaint does not assert that solicitation is "irrelevant." ECF 9-1 at 14. But, the absence of such a statement is not an allegation that the emails were unsolicited.

Third, even if the Court were to infer that plaintiff did not initially invite defendant's emails, that inference would not establish the harm that the privacy-based analogs require. Defendant uses the words "unsolicited," "uninvited," and "unwanted" interchangeably. But, they are not synonyms. For example, an unsolicited email may be wanted, and a once-invited email may become unwanted.

The rulings on which *Carter* relied were based on the recipient's experience. *See, e.g.*, *Krakauer*, 925 F.3d at 653 (Telephone Consumer Protection Act ("TCPA") plaintiffs "must have received unwanted calls on multiple occasions," and the statute requires "a call that [plaintiff] previously took steps to avoid"); *Mulanena v. Ulta Salon, Cosmetics & Fragrance, Inc.*, JRR-25-3753, 2026 WL 1214932, at *7 (D. Md. May 4, 2026) ("Plaintiffs here did not allege that Defendant's emails are unsolicited or unwanted."); *Montes v. Catalyst Brands LLC*, TOR-25-281, 2025 WL 3485827, at *3 (E.D. Wash. Dec. 4, 2025) (same). And, the decision in *Carter* was not based solely on the fact that plaintiffs did not allege that the emails were unsolicited. It also considered that plaintiffs did not "allege that all emails were unwanted or that they ever sought to stop receiving them." *Carter*, 2026 WL 1429258 at *23.

Likewise, the tort of intrusion upon seclusion is concerned with an intrusion "'upon the solitude or seclusion of another or his private affairs or concerns' that 'would be highly offensive to a reasonable person.'" *AFSCME*, 172 F.4th at 369 (quoting Restatement (Second) of Torts § 652B (A.L.I. 1977)). The Complaint does not allege that plaintiff was bothered or disturbed by the emails or give reason to think that "a reasonable person" would find the emails "highly offensive." *Id.* Without such allegations, the Complaint does not describe an intrusion of the kind the law recognizes.

Finally, in *Carter* the Court did not decide that unsolicited, commercial emails suffice to establish standing. I observed that a person who receives emails "that he or she never agreed to receive has **arguably** had his/her digital privacy invaded in a way that **perhaps** resembles the common law torts of intrusion upon seclusion and private nuisance." *Id.* (emphasis added). That was a description of the possible significance of receipt of an unrequested email. Because the

Complaint here alleges neither that the emails were unsolicited nor that they were unwanted, I need not decide whether a plaintiff who made those allegations would have standing.

**3.**

Glamnetic's arguments as to fraud and nuisance fail for the reasons stated in *Carter*, 2026 WL 1429258.

First, as to fraud, defendant argues that the materiality of a subject line "'designed to induce the recipient to open the email' . . . necessarily implicates the recipient's reliance interests and right to make informed decisions free from deception." ECF 9-1 at 17 (quoting ECF 1-2, ¶ 29). But, as stated in *Carter*, "[d]etrimental reliance is the harm-defining element of fraud. A plaintiff is injured not when the false statement is made, but when the plaintiff acts on it, to his or her detriment." *Carter*, 2026 WL 1429258, at *25 (citing *Pruitt v. Resurgent Cap. Servs., LP*, 610 F. Supp. 3d 775, 781 (D. Md. 2022)).

The Fourth Circuit has made clear that "the only elements that matter are the ones that define the harm of the analogous cause of action." *Holmes*, 156 F.4th at 426. An allegation that a statement was "designed to induce the recipient to open the email" and was "material" describes the defendant's conduct. ECF 1-2, ¶¶ 7, 29. It does not describe what happened to the plaintiff. *See Holmes*, 156 F.4th at 426 (an element that "goes to the defendant's liability, not to what is felt by the plaintiff," is not harm-defining).

Here, the Complaint alleges that false urgency makes recipients more likely to open an email, visit the seller's website, or make a purchase. ECF 1-2, ¶¶ 5, 7. It does not allege that plaintiff did any of these things. Indeed, it alleges that she did not make a purchase in response to the challenged message. *Id.* ¶ 50. Allegations about how a practice may affect consumers in

general are not allegations that plaintiff was affected in "a personal and individual way." *Opiotennione*, 130 F.4th at 153 (quoting *Spokeo*, 578 U.S. at 339).

Nor is defendant aided by the observation that MCEMA protects consumers from emails "that create a risk of deception," ECF 9-1 at 10–11. A risk of deception is not deception, and a risk of harm, without more, is not itself a concrete harm in a suit for damages. *See TransUnion*, 594 U.S. at 435–38. As in *Carter*, plaintiff does not allege that she "relied on the misleading subject lines, made any improvident purchases in response to the emails, or suffered any economic consequences from having received them." *Carter*, 2026 WL 1429258 at *25.

The same is true of nuisance. Defendant asserts that *Carter* "found the nuisance analogy inapplicable because the plaintiff there did not allege that the challenged emails were unsolicited and, indeed, wished to continue receiving truthful communications from the defendant." ECF 9-1 at 18 (citing *Carter*, 2026 WL 1429258, at *25). But, solicitation was not the sole basis for that conclusion. The Court also concluded that the plaintiffs "have not alleged any substantial interference with enjoyment of their property," which is the harm-defining element of nuisance. *Carter*, 2026 WL 1429258 at *25.

Plaintiff alleges no such interference here. She identifies three emails that she received over two days. ECF 1-2, ¶¶ 42–46, 62. She does not allege that emails from defendant filled her inbox, consumed storage, cost her time, or disturbed or annoyed her. And, unlike in *Carter*, defendant does not contend that plaintiff was inundated with emails, nor could it on the basis of this Complaint. *Cf. Washington Suburban Sanitary Comm'n v. Cae-Link Corp.*, 330 Md. 115, 126, 622 A.2d 745, 750 (1993) (nuisance requires that "the complained of interference . . . cause actual physical discomfort and annoyance to those of ordinary sensibilities, tastes and habits").

As in *Carter*, 2026 WL 1429258, at *26, plaintiff alleges that she "experienced a legal wrong, but not the kind of harm that fraud or nuisance is designed to remedy." Nor does she "demonstrate the requisite 'close relationship' between her injury and the common law torts of fraud and nuisance."

**4.**

Defendant also contends that plaintiff alleges "precisely the injury targeted by the Maryland Legislature." ECF 9-1 at 10. The Court rejected a similar contention in *Carter*, 2026 WL 1429258, at *17.

It may be true that the General Assembly intended to prevent the dissemination of the kind of emails at issue. But, that circumstance is not dispositive as to whether plaintiff has suffered a cognizable injury in fact, within the meaning of Article III. As the Supreme Court has said, "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *TransUnion*, 594 U.S. at 426–27. Courts "cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so." *Id.* at 426 (citation omitted).

Defendant's reliance on *Baehr*, 953 F.3d 244, is also unavailing. Defendant reads *Baehr* to hold that a statutory violation alleging an intangible injury satisfies Article III when "(1) the alleged harm is the type the legislature sought to prevent, and (2) the alleged harm bears a close relationship to a harm traditionally recognized at common law." ECF 9-1 at 8 (citing *Baehr*, 953 F.3d at 252). Even on defendant's reading, both conditions must be met; the first cannot substitute for the second. And, for the reasons stated, plaintiff has not alleged harm bearing a close relationship to intrusion upon seclusion, nuisance, or fraud. Moreover, the first condition concerns

"the harm stemming from the 'defendant's statutory violation.'" *Baehr*, 953 F.3d at 253 (citation omitted).

The question, then, is whether plaintiff alleges that she suffered such a harm. She does not. Notably, *Baehr* itself concluded that the plaintiffs there lacked standing. *Id.* at 254.

Defendant's account of the General Assembly's purposes in enacting the statute underscores the problem. According to defendant, deceptive spam causes frustration, impedes the efficient use of computer resources, and shifts costs to consumers, and MCEMA was intended to protect consumers from becoming "victims of fraud and schemes initiated by false and misleading email." ECF 9-1 at 9 (quoting *MaryCLE, LLC v. First Choice Internet, Inc.*, 166 Md. App. 481, 511, 890 A.2d 818, 835–36 (2006)). Plaintiff does not allege that she experienced any of these harms.

Moreover, the case of *Beyond Systems*, 777 F.3d 712, does not assist defendant. There, the Fourth Circuit reasoned that Article III standing existed because the plaintiff "claimed a harm, receiving spam e-mail, and Maryland and California law create an interest in being free from such harm." *Id.* at 716. That reasoning rests on the proposition that a statutory interest, by itself, suffices—a proposition that *Spokeo* and *TransUnion* later rejected. *See Smith*, 2026 WL 1745684, at *2 ("*Spokeo* and *TransUnion* have since rejected [the reasoning in *Beyond Systems*]. Indeed, the Fourth Circuit has since reiterated that pleading a statutory violation does not, in itself, establish a concrete injury for standing purposes.") (citing *Garey*, 35 F.4th at 921) (alteration added); *Asabre*, 2022 WL 4326536, at *2 (observing that *Beyond Systems* "did not discuss the plaintiff's alleged harms from receiving spam email").

Nevertheless, defendant maintains that the "core holding" of *Beyond Systems* was "reaffirmed in principle by subsequent Fourth Circuit decisions." ECF 9-1 at 8. However,

defendant fails to cite any post-*TransUnion* decision of the Fourth Circuit that applies *Beyond Systems* to establish standing. To the contrary, the Fourth Circuit has since explained that "[t]he intangible harm of enduring a statutory violation, standing alone, typically won't suffice under Article III—unless there's separate harm (or a materially increased risk of another harm) associated with the violation." *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 243 (4th Cir. 2023). As plaintiff also notes, *Beyond Systems* arose in a very different setting: the plaintiff there was an internet service provider that was found to have solicited the very emails of which it complained. ECF 10 at 4–5 (citing 777 F.3d at 714–16, 719).

The out-of-circuit decisions on which defendant relies do not fill the gap. These cases were addressed in *Carter*. *See* 2026 WL 1429258, at *21–23 (collecting cases). The California decisions arose under a statute that, by its terms, applies only to unsolicited commercial email, and the complaints in those cases alleged that the emails were unsolicited, unwanted, or sent without the recipients' consent. *See, e.g.*, *Whittaker v. Tactical USA, LLC*, JAM-23-2914, 2024 WL 1855645, at *1 (E.D. Cal. Apr. 29, 2024) (alleging receipt of "unsolicited commercial email advertisements . . . which they never directly consented to receive"). Likewise, *Brinton v. Vivint Inc.*, TMC-23-6105, 2024 WL 3688589 (W.D. Wash. Aug. 7, 2024), and *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999 (W.D. Wash. 2019), proceeded on the premise that the Washington statute addresses unwanted, unsolicited email. And, the TCPA decisions on which defendant relies involve a statute directed at communications the recipient did not invite and, in *Krakauer*, telephone calls that the plaintiff "previously took steps to avoid." *Krakauer*, 925 F.3d at 653.

Plaintiff alleges no comparable step here. Notably, more recent decisions from Washington courts reject standing based on the mere receipt of misleading subject lines. *See* ECF 10 at 5 (collecting cases); *Montes*, 2025 WL 3485827, at *3; *Nuri*, 2026 WL 864886, at *3.

Moreover, defendant does not identify any decision in the District of Maryland after *TransUnion* that has found Article III standing with respect to a claim such as this one. As plaintiff notes, ECF 7-1 at 8, other judges of this District have concluded that an MCEMA violation, without more, does not suffice. *See, e.g.*, *Smith*, 2026 WL 1745684; *Volk v. Jill Acquisition LLC*, JKB-25-3752 (D. Md. June 11, 2026); *Crooks v. Coty DTC Holdings, LLC*, RDB-26-0078, 2026 WL 1265422 (D. Md. May 8, 2026); *Mulanena*, 2026 WL 1214932. For example, in *LaTouche v. True Religion Apparel, Inc.*, RDB-26-914, 2026 WL 2221402, at *1 (D. Md. Aug. 3, 2026), Judge Bennett found no standing even though the complaint alleged that the plaintiff received three to five marketing emails per day, her inbox was clogged with spam, and her data space was wasted. He reasoned that the suit did not allege that the plaintiff personally regarded the emails as unwanted, relied on them to her detriment, or spent significant time reviewing or deleting them. *Id.*[1]

**5.**

Plaintiff does not allege that she had an account with defendant or made a purchase from defendant. In contrast, in *Carter*, the plaintiff was a customer of defendant. But, that factual difference does not bear the weight that defendant places on it.

*Carter* did not hold that a plaintiff who lacks a purchasing relationship is thereby deemed to have received unsolicited or unwanted emails. The Court examined what the complaint alleged. The facts missing in *Carter*, and also missing here, are allegations that the plaintiff regarded the emails as an unwelcome intrusion, objected to them, or sought to stop them. Without such

---

[1] Although plaintiff cited these cases in her Motion, ECF 7-1 at 7, 8, defendant did not address them in the Opposition.

allegations, defendant's privacy-based analogies fail. And, the solicitation distinction does nothing to cure the defendant's fraud and nuisance analogies, which fail because plaintiff does not allege reliance or any interference with the use and enjoyment of property.

Put simply, plaintiff alleges that she received three emails, one of which had a deadline in the subject line that she contends was false. Nevertheless, she did not purchase anything from the defendant. As in *Carter*, the Complaint does not contain any allegation of reliance by plaintiff; a purchase influenced by the subject lines; or any other tangible or intangible harm, beyond the fact of receiving emails with allegedly deceptive subject lines. *See Carter*, 2026 WL 1429258, at *26. Like the plaintiffs in *Carter*, Cowan merely alleges a legal wrong, i.e., a statutory violation by defendant, and seeks to monetize it, as the statute permits.

This is precisely the type of "bare procedural violation" that, under *TransUnion* and *Spokeo*, does not confer Article III standing. "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion*, 594 U.S. at 426–27.

Defendant has not carried its burden of demonstrating that plaintiff has suffered a concrete injury in fact for purposes of Article III standing. It follows that this Court lacks subject matter jurisdiction. *See White Tail Park*, 413 F.3d at 458–59. Because the Court lacks jurisdiction, it must remand the case to State court. 28 U.S.C. § 1447(c); *ColonialWebb Contractors Co.*, 175 F.4th at 258. I express no view as to the merits of plaintiff's claim under MCEMA.

### B. Subject Matter Jurisdiction

#### 1. Contentions

In the alternative, plaintiff contends that defendant has not established the amount in controversy required for jurisdiction under either 28 U.S.C. § 1332(a) or CAFA. ECF 7-1 at 8–

14. Plaintiff "does not challenge complete diversity, CAFA minimal diversity, or CAFA numerosity for purposes of this motion." *Id.* at 4. And, those requirements appear to be satisfied.

Cowan is a citizen of Maryland, and defendant's members are citizens of Florida and California. ECF 1-2, ¶ 9; ECF 1, ¶ 29. Defendant submitted the Declaration of Kevin Gould (ECF 1-3, "Gould Declaration"), a member of Glamnetic (*id.* ¶ 1), in which he states that defendant sent each email identified in the Complaint to more than 1,000 Maryland consumers. *Id.* ¶ 8. Only the amount in controversy is disputed.

Because plaintiff lacks Article III standing, remand is required regardless of how the amount-in-controversy dispute is resolved. CAFA and § 1332(a) are statutory grants of jurisdiction and cannot supply a case or controversy that Article III withholds. *See Shamrock Oil*, 313 U.S. at 108–09; *Raines*, 521 U.S. at 820 n.3. Additional evidence as to the amount in controversy therefore could not cure the defect in plaintiff's standing. Nevertheless, I shall briefly address the parties' contentions.

As indicated, plaintiff contests defendant's allegations regarding the amount in controversy. Therefore, defendant must establish, by a preponderance of the evidence, that the jurisdictional threshold is met. *Dart Cherokee*, 574 U.S. at 88–89; *see* 28 U.S.C. § 1446(c)(2)(B). Defendant may rely on reasonable estimates, inferences, and deductions, but they must rest on facts that permit a determination, and not on speculation. *Scott*, 865 F.3d at 196–97. Apart from the Gould Declaration, defendant did not submit any evidence to support its position.

**2. Diversity Jurisdiction**

For purposes of § 1332(a), the claims of putative class members may not be aggregated. At least one named plaintiff must have an individual claim exceeding $75,000. *Snyder v. Harris*, 394 U.S. 332, 335 (1969); *Rosmer*, 263 F.3d at 122. Plaintiff's individual claim is for statutory

damages of $500 for the one allegedly false deadline email that she received on July 24, 2026. ECF 1-2, ¶¶ 42–50, 62–65; C.L. § 14-3003. Defendant offers two grounds for concluding that her individual claim exceeds $75,000.

First, defendant relies on plaintiff's allegation that "the amount sought in this action exceeds $75,000, exclusive of interest and costs." ECF 1-2, ¶ 92; *see* ECF 9-1 at 21. But, that allegation was made pursuant to Maryland Rule 2-305, which provides that a demand exceeding $75,000 shall not specify the amount sought, but shall instead state only that the amount exceeds that figure. *See* ECF 10 at 8. It speaks to the amount sought "in this action," which is a putative class action brought on behalf of plaintiff and a proposed class. ECF 1-2, ¶¶ 66–75, 93. It does not allege that plaintiff's individual claim exceeds $75,000. To treat it as such would aggregate the class members' claims, which *Snyder* forbids.

Nor does the allegation constitute a specific "sum demanded" that would control under 28 U.S.C. § 1446(c)(2)(A). Defendant may challenge the amount in controversy. But, it must establish by a preponderance of the evidence that the amount asserted by plaintiff fails to meet the minimum requirement. *See* 28 U.S.C. § 1446(c)(2)(A)(ii), (B).

The case of *Dart Cherokee*, 574 U.S. 81, does not accord plaintiff's allegation the "significant weight" defendant ascribes to it. ECF 9-1 at 21. That decision concerns the sufficiency of a defendant's removal allegation and the proof required when the amount is contested. *Dart Cherokee*, 574 U.S. at 87–89. Likewise, *Gardner v. AMF Bowling Centers, Inc.*, 271 F. Supp. 2d 732, 733 (D. Md. 2003), is inapposite. It concerned a plaintiff who reduced her demand after removal. Plaintiff here does not seek to reduce a demand; she contends that her Complaint never alleged an individual damages amount in excess of $75,000.

Second, defendant contends that statutory attorney's fees push plaintiff's claim over the threshold. ECF 9-1 at 21–22. Fees authorized by statute may be included in the amount in controversy. *Francis*, 709 F.3d at 368. But, in a putative class action, when testing diversity jurisdiction, fees ordinarily are allocated pro rata among class members. *See Ayers v. CIOX Health, LLC*, 735 F. Supp. 3d 607, 619 (D. Md. 2024); *Mattingly v. Hughes Elecs. Corp.*, 107 F. Supp. 2d 694, 697–98 (D. Md. 2000).

Defendant offers no hours, rates, budget, or allocation from which the Court could conclude that plaintiff's share of recoverable fees would exceed $74,500. Its assertion that fees in a class action "of this complexity" will "readily" exceed the threshold is not evidence. ECF 9-1 at 21–22. Nor can defendant rely on costs, which are excluded from the calculation. 28 U.S.C. § 1332(a).

In sum, defendant has not established, by a preponderance of the evidence, that plaintiff's individual claim exceeds $75,000.

### 3. CAFA Jurisdiction

Under CAFA, the aggregate amount in controversy must exceed $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2), (d)(6). At $500 per violation, defendant must therefore establish more than 10,000 qualifying recipient-message combinations, or fees sufficient to bridge any shortfall. Defendant's showing rests on the Gould Declaration, which states that, "[b]ased on available records and information," defendant sent each message identified in the Complaint to "more than 1,000 consumers located in Maryland." ECF 1-3, ¶ 8. The Declaration provides no campaign-level counts.[2]

[2] The Notice of Removal states that Gould declared that defendant sent "more than 10,000" of the identified messages to Maryland consumers. ECF 1, ¶¶ 10, 14. As plaintiff points out, the

The first dispute concerns how many messages count as violations. The Complaint's table contains sixteen messages. ECF 1-2, ¶ 36. Nine are deadline or finality subject lines, and seven are later messages announcing that a promotion was extended or remained available. *Id.* Defendant contends that all sixteen are part of a single deceptive "process," which, at 1,000 recipients each, yields $8,000,000. ECF 9-1 at 19–20.

However, the Complaint alleges that it is the deadline subject lines which violated MCEMA. ECF 1-2, ¶¶ 82–85. It pleads the extension messages as evidence that the earlier deadline statements were false, and it expressly disclaims any allegation that "an email accurately announcing an extension is itself false merely because it announces the extension." *Id.* ¶ 47; *see* ECF 7-1 at 11.

The proposed class is defined by receipt of a deadline or finality subject line when the same or a materially similar offer was later extended or continued. ECF 1-2, ¶ 67. MCEMA liability attaches to a message whose subject line contains false or misleading information. C.L. §§ 14-3002(b), 14-3003. That the extension messages are integral evidence of a scheme does not make each of them a separate violation.

The amount in controversy is "'the amount that will be put at issue in the course of the litigation.'" *Ayers*, 735 F. Supp. 3d at 613 (quoting *Scott v. Cricket Commc'ns, LLC*, 865 F.3d 189, 196 (4th Cir. 2017)). That inquiry looks to the result of a judgment on the asserted claims and defendant cannot enlarge the claims that plaintiff has pleaded. *See Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002).

---

Declaration does not contain that assertion. ECF 7-1 at 10–11. Defendant's Opposition relies on what the Declaration actually states. ECF 9-1 at 19.

Thus, at most, nine messages are actionable. Defendant concedes that the nine messages sent to "more than 1,000" recipients yield at least 9,009 recipient-message combinations, or $4,504,500. ECF 9-1 at 20. That sum falls $495,500 short of the threshold.

Defendant offers three arguments for why the amount in controversy nonetheless bridges that gap. None is supported by evidence.

First, defendant says that the "more than 1,000" figure is "a conservative floor, not a ceiling." ECF 9-1 at 20. This may be true but does not establish how far above the floor the real figure lies.

Second, defendant points to the three-year class period and to the Complaint's statement that the sixteen messages are non-exhaustive. *Id.* But, the Complaint's examples span nearly the entire class period, and there is no evidence of any other qualifying campaign, much less of how many Maryland recipients received it. Nor does the Complaint plead frequency from which volume could be projected.

Third, defendant applies a twenty percent fee to the statutory damages. ECF 9-1 at 20. It cites for support the case of *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 684–85 (D. Md. 2013), which approved a class settlement under the percentage-of-recovery method. That decision addressed fees awarded from a common fund after a recovery had been created. It did not hold that a removing defendant may presume a percentage of claimed damages as the measure of future fee-shifting. Indeed, defendant recites a range of twenty-five to thirty percent and then applies twenty percent without explanation.

MCEMA provides for "reasonable" attorney's fees, and Maryland ordinarily calculates statutory fee awards under the lodestar method. *See Sugarloaf All., Inc. v. Frederick Cnty.*, 495 Md. 84, 116, 360 A.3d 517, 536 (2026) (citing *Friolo v. Frankel*, 373 Md. 501, 523, 819 A.2d 354,

367 (2003)). Nor does defendant provide estimates of hours, rates, or tasks, to support a lodestar fee. In *Carter*, I applied the *Singleton* range, but only to test the plausibility of an uncontested allegation. *Carter*, 2026 WL 1429258, at *7.

On this record, defendant has not established, by a preponderance of the evidence, that a sum in excess of $5,000,000 is in controversy. The shortfall is relatively modest, and defendant might have attempted to close it with actual campaign counts and a supported fee estimate. *See Dart Cherokee*, 574 U.S. at 88–89 (stating that "both sides submit proof"). In any event, even if defendant had carried its burden on the amount in controversy, the absence of Article III standing requires remand.

## IV. Conclusion

For the foregoing reasons, I shall grant plaintiff's Motion to Remand (ECF 7). Therefore, I shall remand the case to the Circuit Court for Baltimore City.

An Order follows, consistent with this Memorandum Opinion.

Date: November 13, 2026

/s/
Ellen Lipton Hollander
United States District Judge